1  **Pierce Bainbridge Beck Price & Hecht LLP**
   Brian J. Dunne (SBN 275689)
2  *bdunne@piercebainbridge.com*
   Yavar Bathaee (SBN 282388)
3  *yavar@piercebainbridge.com*
   Dan Terzian (SBN 283835)
4  *dterzian@piercebainbridge.com*
   355 S. Grand Ave., 44th Floor
5  Los Angeles, California 90071
   (213) 262-9333
6
   *Counsel for Plaintiff Tulsi Now, Inc.*
7
                 THE UNITED STATES DISTRICT COURT
8            FOR THE CENTRAL DISTRICT OF CALIFORNIA

9  **Tulsi Now, Inc.**, a principal        Case No. 2:19-cv-06444-SVW-RAO
   campaign committee,
10                                          **First Amended Complaint for
                    Plaintiff,              Violations of:**
11
          v.                                1. **First and Fourteenth
12                                             Amendments**
   **Google**, LLC, a Delaware limited     2. **Declaratory and Injunctive Relief**
13 liability company, and **Does 1–10**,
14                 Defendants.              **JURY TRIAL DEMANDED**
15
16
17
18
19
20
21
22
23
24

Plaintiff Tulsi Now, Inc. (the "Campaign"), principal campaign committee for Presidential candidate Tulsi Gabbard, brings this lawsuit against Defendant Google, LLC ("Google") for serious and continuing violations of the Campaign's right to free speech. Since at least June 2019, Google has used its control over online political speech to silence Tulsi Gabbard, a candidate millions of Americans want to hear from. With this lawsuit, Gabbard seeks to stop Google from further intermeddling in the 2020 United States Presidential Election.

## **INTRODUCTION**

1.      We live in a time of unprecedented political upheaval and division in the United States. Uncertainty and mistrust in American institutions—most notably, the United States government—are at record highs. Everything from basic norms of civility and compromise to the sanctity of American elections suddenly seems in flux. Americans wonder how we got here, and they want to know where we're going.

2.      Against this backdrop, it is not surprising that the race for the 2020 Democratic nomination for President of the United States is the most hotly contested—and the most politically open—in recent memory. Americans want to hear fresh, diverse voices as they seek a new leader in this time of turmoil. Americans ***need*** to hear those voices.

3.      Tulsi Gabbard is one of those voices. Gabbard is a four-term United States Congresswoman, a Major with over sixteen years in the National Guard, and the first female combat veteran to run for President.

4.      In the June 26-27, 2019 Democratic Party presidential debates, tens of millions of Americans got to hear Gabbard's voice for the first time. And people liked what they heard: Gabbard quickly became the most searched-for Democratic presidential candidate on June 27-28. In the crucial post-debate period—a time when presidential candidates receive outsize interest, engagement, and donations—Americans around the country wanted to hear more from Tulsi Gabbard.

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

5.     To speak to these Americans, Gabbard operated a Google Ads account (the "Account").  A Google Ads account allows a political candidate to speak directly to people who want to hear from her.  For example, millions of people were searching for information on Gabbard on June 27-28, 2019.  Through Google Ads, Gabbard could instantaneously and directly speak to these people by linking them to her webpage, which provides information about Gabbard's background, policies, and goals.

6.     Or at least that is how things are ***supposed*** to work on Google's search platform—one of the largest forums for political speech in the entire world.  In practice, however, Google plays favorites, with no warning, no transparency—and no accountability (until now).

7.     On June 28, 2019—at the height of Gabbard's popularity among internet searchers in the immediate hours after the debate ended, and in the thick of the critical post-debate period (when television viewers, radio listeners, newspaper readers, and millions of other Americans are discussing and searching for presidential candidates), Google suspended Tulsi's Google Ads account without warning.

8.     For hours, as millions of Americans searched Google for information about Gabbard, and as Gabbard was trying, through Google, to speak to them, her Google Ads account was arbitrarily and forcibly taken offline.  Throughout this period, the Campaign worked frantically to gather more information about the suspension; to get through to someone at Google who could get the Account back online; and to understand and remedy the restraint that had been placed on Gabbard's speech—at precisely the moment when everyone wanted to hear from her.

9.     In response, the Campaign got opacity and an inconsistent series of answers from Google.  First, Google claimed that the Account was suspended because it somehow violated Google's terms of service.  (It didn't.)  Later, Google changed its story.  Then it changed its story again.  Eventually, after several hours of bizarre and conflicting explanations while the suspension dragged on, Google suddenly reversed course completely and reinstated the Account.  To this day, Google has not provided a

straight answer—let alone a credible one—as to why Gabbard's political speech was silenced right precisely when millions of people wanted to hear from her.

10.    But here's the thing: Gabbard's Google Ads account **had already been pre-verified**, through a series of exacting hurdles, by Google.  Specifically, in February 2019—months before Gabbard's suspension—Gabbard's Google Ads account was approved through Google's Verified Political Advertiser program.  Google knew **exactly** who was operating Gabbard's Google Ads account (Tulsi Gabbard) and for what purpose (to speak to potential voters about Gabbard's candidacy).

11.    Google's Verified Political Advertiser Program—a prior restraint on political speech—was justified by Google for a single purpose: to prevent foreign intermeddling in elections.  But Google's suspension of Gabbard's account did not even purport to assert that Gabbard's account—a verified account running indisputably normal campaign ads about Gabbard and her candidacy—was somehow a foreign intermeddler in the 2020 U.S. Presidential Election.  Instead, Google cited justifications that could not justify a prior restraint on political speech even if they turned out to have merit (which in fact they did not).

12.    Through its Verified Political Advertiser Program and other express actions, Google has taken and continues to take State action by exercising control over a traditional State function: running elections.  In fact, Google's internal memoranda and communications make clear it recognizes this fact.  But with State action comes Constitutional burdens, and rightly so: Google's actions in unilaterally and arbitrarily imposing and contorting prior restraints on the speech of political candidates would have outraged the Founders.  They are anathema to our political system.

13.    Google's arbitrary and capricious treatment of Gabbard's campaign should raise concerns for policymakers everywhere about the company's ability to use its dominance to impact political discourse, in a way that interferes with the upcoming 2020

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

presidential election.  In this case, Google has sought to silence Tulsi Gabbard, a presidential candidate who has vocally called for greater regulation and oversight of (you guessed it) Google.  But this could happen to any candidate running in any election.

14.    With this lawsuit, Tulsi is fighting back.  She will be heard.

15.    Through its illegal actions targeting Tulsi Gabbard, Google has caused the Campaign significant harm, both monetary (including potentially millions of dollars in forgone donations) and nonmonetary (the ability to provide Tulsi's important message with Americans looking to hear it).  But even more pressing is the ongoing threat of targeted intermeddling in the 2020 United States presidential election by Google—an out-of-control tech giant looking to play favorites unless enjoined by this Court.

16.    The Campaign seeks declaratory and injunctive relief against Google for its illegal behavior.

## JURISDICTION AND VENUE

17.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 over the claims in this action.

18.    This Court has personal jurisdiction over Google.  Google is pervasively present in California and in this judicial district, and is subject to general personal jurisdiction throughout this State.

19.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), and (c).  Google has multiple large offices in and around Los Angeles, California within this judicial district, which houses engineering, sales, and marketing operations for Google Ads, such that it is both a resident of this district for venue purposes with respect to this matter and a substantial portion of the events and actions giving rise to the claims in this matter took place in this judicial district.  This Los Angeles County office space currently exceeds 825,000 square feet, and in January 2019 Google leased an additional 584,000 square feet on top of that.  Google also has engineering operations in Santa Barbara County, California.  Those engineering operations regard Google's algorithms

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

and artificial intelligence.  Those operations are expanding into over 68,000 square feet of office space.

## PARTIES

20.    Plaintiff Tulsi Now, Inc. is a principal campaign committee for Tulsi Gabbard, a candidate for President of the United States.

21.    Defendant Google, LLC is a Delaware limited liability company with a principal place of business in Mountain View, California.  Google regularly conducts business throughout California and in this judicial district—for example, at its large Venice, California offices, which house Google Ads engineering, marketing, and sales operations.

22.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 through 10, inclusive, are presently unknown to Plaintiff, and for that reason these defendants are sued by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each of the Doe defendants is in some way legally responsible for the violations of law and injuries and harm caused as alleged herein.  If and when appropriate, Plaintiff will seek leave of court to amend this complaint when the true names and capacities of said defendants are known.

## FACTS

## I.    GOOGLE'S UNRIVALED DOMINANCE IN SEARCH

### A.    Google's Virtuous Circle

23.    Among the most dominant companies in the United States, Google reigns supreme.  The company's crown jewel is its search business, which provides Google with direct access to the desires and preferences of hundreds of millions of users throughout the world.

24.    Each day, users tell Google precisely what they're looking for.  And Google's vast technological infrastructure, which scours countless webpages, tell those users where on the Internet they can find it.

25.     This window into what a user wants is Google's most valuable asset.  And the more tailored and personalized Google's search results are, the more information users will provide to Google (as opposed to some ostensible competitor).  The complex machine-learning and vast repository of personal information Google uses to run its search business is unparalleled in sophistication, and as a result, Google's searches have become uncanny and even at times prescient.

26.     The bargain Google has struck with Internet users is a powerful one.  The users value Google's searches so much that they continue to provide Google with their data, which Google then uses to improve its search capabilities.  What results is a virtuous circle—a feedback loop—that makes Google virtually the only company operating in the search market at scale.

27.     The network effects of this feedback loop are staggering.  Google is, as a result, the gateway to the internet.  Web browsers on the majority of computers accessing the internet every day open up to Google's search engine by default.  Search bars on web browsers and operating systems also route queries straight to Google.  This has made web browsing virtually synonymous with the Google search product.  Indeed, major English dictionaries include the verb, "to google," which means "to search the internet for information about (a person, topic, etc.)."

28.     Google's own web browser, Chrome, has 51% of the web browser market, and that browser places Google's search product at the center of its focus.

29.     Google has as a result of this ubiquity and dominance achieved an 88% share of the U.S. search market.  The second-place search engine run by Microsoft, Bing, occupies a paltry 6% of the market, with Yahoo! and DuckDuckGo at 4% and 1%, respectively.

30.     The numbers are even starker when searches through all platforms, including, for example, YouTube and Google Maps, are considered.  Data reported by Jumpstart lists Google as holding a 94% share of the cross-platform search market, with Yahoo! in a distant second at 2% market share.

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

31. Put simply, Google is synonymous with search. Google is the definition of market dominance and no one comes close to matching or challenging it.

**B.   Google's Search Advertising Business**

32. Google monetizes the valuable user information it collects through its search product by displaying ads alongside search results.

33. These ads are mostly either paid for per-click or by user impression. For many of the ads displayed by Google, monetization depends on relevance to the user and his search query. Google thus leverages the vast data it receives from all over the Internet to match advertisements with its users.

34. Google is one of two companies that does this in the search market at scale, with Microsoft far behind in ad volume and users.

35. Google's search-based advertising revenues are jaw dropping. Google LLC, the search-base arm of Google's parent company, Alphabet, reported $136 billion in revenue for its 2018 fiscal year, with $116 billion in revenue coming from its advertising business.

36. The reach and power of Google's advertising platform is unprecedented. For the first time in history, an advertiser can upload or input an ad onto Google's platform, precisely target search terms it would like the ad to run alongside, and then broadcast the ad to millions in a matter of days or even hours. All of this is typically done without speaking to a single person, without negotiations, and without complex pricing.

37. Google's advertising platform is so powerful that it is rapidly diminishing the size and significance of traditional advertisement media, such as print and television.

38. As Google's Director of Economic Policy told the U.S. House Committee on the Judiciary's Subcommittee on Antitrust, Commercial, and Administrative law on July 16, 2019:

> Across the wider business sector, the share of GDP going to advertising in media has dropped by roughly 25% in the U.S. since 2000. That's because digital ads are more relevant for users and more efficient for merchants. A recent report

showed that for every $3 spent on digital advertising, advertisers would have to spend $5 on print advertising to get the same impact.

39.     Google's advertising platform also provides advertisers with the ability to time their ads with expected events that would cause an uptick in related search terms. All of this is virtually permission-less and frictionless—"Self-Service" advertising, as Google called it when it launched the first iteration of its AdWords product on October 23, 2000.  As Google's press release launching that product explained:

> Google's AdWords program offers the following features:
>
> - **New ads appear instantly:**  Ads are online immediately after an order is placed.
>
> - **Ad preview tools:**  Shows how an advertisement will look before it's posted on Google's search results page.
>
> - **Unlimited ad creation:**  Advertisers can create and run as many different versions of an ad to see which ones get the best response from users.
>
> - **Advanced keyword targeting options:**  Several targeting options are available to enable the fine-tuning of a campaign, including keywords, negative keywords, phrase matches, and exact matches.
>
> - **Web-based reporting tools:**  Instant access to online reporting tools that deliver click-through rates and number of impressions delivered.
>
> - **Ad performance feedback:**  Advertisers see real-time feedback—in the form of a visitor interest bar—to gauge the overall effectiveness and popularity of an ad.[1]

40.     With some changes, particularly to the advertisement approval process, these features largely remain the same nearly two decades later.  In contrast to traditional media, an ad run on Google's platform allows experimentation, real-time feedback, and highly specific targeting of users and search terms.

---

[1] Google Launches Self-Service Advertising Program, dated Oct. 23, 2000, http://googlepress.blogspot.com/2000/10/google-launches-self-service.html.

41.     There is, in short, no means of advertising directly alongside the bulk of the search activity in the United States but through Google.  Because Google is the gatekeeper of search, it is the gatekeeper of search-based advertising.  There is no sub-stitute—not even close.

## C.     The Organic Page Ranking Process

42.     Without advertising, obtaining web traffic from Google's search platform requires appealing to the value system embodied by Google's ranking algorithms.

43.     Raising the profile of a webpage has become a profession in and of itself. Search Engine Optimization ("SEO") is the practice of structuring webpages and refer-ring links to increase the ranking of a page or pages on search engines.

44.     The entire SEO profession is now almost entirely devoted to increasing webpages' profiles *exclusively* on Google's search platform.  Because no search rival comes close, it makes no sense to expend significant reinforces optimizing for other platforms.  This, in turn, also maintains the dominance of Google's ranking and value system, as the entire web is strongly incentivized to structure itself in a manner that will be rewarded by Google's search algorithms.

45.     Without pre-existing interest in a page or significant SEO, it is virtually impossible for a user to discover a newly posted page or even to discover a page about a popular topic.

46.     The only way to bootstrap Google's organic search index process is through advertising, and Google stands ready to monetize this important fact.

47.     Put simply, for a new webpage, the only viable choice is to advertise, and the most efficient way to do so is to pay Google to appear alongside its search results—the way in which Google controls what content users "see" on the Internet hundreds of millions of times per day.

1

## II.   GOOGLE'S UNILATERAL POWER OVER POLITICAL SPEECH ON THE INTERNET

2

48.     Google is a vital tool for political causes.  A webpage dedicated to a polit-

3

ical issue or candidate may as well be invisible on the Internet if it is not indexed by

4

Google's search engine.  And if that page is poorly ranked (for example, appearing on

the second page of search results), it is unlikely to get any traffic.

5

49.     Google's role in the dissemination of political information is so vital that

6

governments throughout the world seek to suppress dissenters by censoring Google.

7

Google knows this.  In fact, in March 2018, an internal presentation entitled, "The Good

8

Censor," which was leaked and published by Breitbart News, makes clear that Google

9

understands its role in global politics.

10



11

12

13

14

15

16

17

18

50.     Google plainly recognized that "censorship" by Google could give "gov-

19

ernments—and companies—the power to limit the freedom of individuals."

20

21

22

23

24



51.     Google's internal presentation was clear that "Users, Governments & Tech firms are all behaving badly."  The presentation identified several reasons why:  (a) "[c]ommunication is fast and frictionless" on the internet, (b) "[a]nonymous conflict is possible," (c) "[e]veryone has a voice," (d) users "meet like-minded people," and (e) "[s]cale is unprecedented."

52.     On this issue, Google was right—the scale is unprecedented.  The Internet allows political discourse—and even political manipulation—at a scale never before seen in history.  As Google explained in its presentation, the Internet allows political discourse to be "supernational."  No government, no ruler or army has a cross-section powerful enough to shut down the Internet.  Google is the only thing sitting between users worldwide and the webpages hosted on the Internet.

53.     As Google's presentation further explained, government actors use bots, troll farms, restrictions, and cyberattacks to censor the internet:



54.     Google, however, has direct access to the flow of information.  Removing a webpage from its search engine ensures that the page is relegated to complete obscurity.  This is a power no government has but every government wants.  If governments had this power, they would not have to resort to troll farms or bots to restrict the flow of information.

55.     As Google's own presentation recognized, governments have to come to Google to censor the internet.  If Google does not agree, even governments have no direct power over political speech on the internet.



56.     In its internal presentation, Google identified serious issues with how technology firms manage political speech on the internet, including "inconsistent interventions," a "lack of transparency," and the "underplaying of issues."



57.     Google further identified additional problems, including "[s]low corrections," "[g]lobal inconsistency," and "reactionary tactics."



58.     The picture that emerges is that Google is plainly aware that tech platforms "are quick to censor and slow to reinstate content that was wrongfully taken down." Critically, Google's presentation made the following observation:

> While the platforms can suspend an account in an instant, users often endure a slow and laborious appeals process, compounding the feeling of unfair censorship.

59.     The presentation further noted that these problems would often be corrected only if they did not blow over:

> When a problem emerges, the tech platforms seem to take their time and wait to see if it's going to blow over before wading in with a solution or correction.  The lag gives users and governments plenty of time to point fingers, gather supporters and get angrier.

60.     As Google recognized, dealing with the problems of political discourse on the internet would require a transition from passive facilitation of speech to "active curation."  In other words, regulation.  As Google explained in its internal presentation:

> **Tech firms have been moving from passive facilitation to active curation**
>
> In response to public outcries about the accessibility of unsavory and harmful content, tech firms have been adjusting their

software to make it harder to stumble upon it.  Google's au-
tocomplete blacklist means it's less likely that children will
link to pornography while completing their biology home-
work.  And by banning ads from payday lenders, Google also
made it a little less likely that their parents would become en-
trapped by exorbitant interest fees.

61.     As stated above, Google actively regulates the information provided to us-
ers to further ostensible policy goals.  In doing so, Google has expressly assumed a
traditional state function—policing content based on its own views of public good.

## III.  GOOGLE IMPOSES A PRIOR RESTRAINT ON POLITICAL AND ELECTION SPEECH

### A.  Google Pledges to Impose Stricter Regulations in Response to Election Interference.

62.     During the 2016 presidential election, state-sponsored content farms
sought to interfere with the U.S. presidential elections.  One of the core strategies em-
ployed by these state-sponsored operations was to create content that would mobilize
or radicalize some segment of the U.S. voting population during an election.

63.     Internet advertisements allowed a direct input into the content displayed to
millions of Americans daily.  Google's search-based advertising, in particular, allowed
content farms and state-sponsored entities to display ads alongside carefully targeted
keywords for a fraction of the cost and risk associated with traditional intelligence or
disinformation operations.

64.     After the 2016 election, Google discovered that foreign agents had pur-
chased ads on its wide-ranging networks in an effort to interfere with the 2016 presi-
dential election.  Google's own internal investigation of the matter showed that foreign
agents had purchased both search ads and traditional display ads on Google's advertis-
ing network.

65.     Google also found tens of thousands of dollars worth of ads with political
material that were purchased from foreign internet addresses, foreign building ad-
dresses, or purchased with foreign currency.  Although not definitively purchased by

1    foreign government agents, their content and timing made it unlikely that they were

2    purchased by ordinary foreign citizens.

3         66.    Google responded to reports that its advertising platform had been used by

4    foreign agents with a statement:

5              We have a set of strict ads policies including limits on politi-
               cal ad targeting and prohibitions on targeting based on race
6              and religion.  We are taking a deeper look to investigate at-
               tempts to abuse our systems, working with researchers and
7              other companies, and will provide assistance to ongoing in-
               quiries.

8         67.    Google's existing advertising policies had proven inadequate to prevent

9    widespread manipulation of its service.  To avoid further public outrage at its enabling

10   of foreign disinformation campaigns, Google would have to take more drastic measures.

11        68.    On November 1, 2017, Google was called before the House Intelligence

12   Committee.  Google's Senior Vice President & General Counsel, Kent Walker, opened

13   his testimony before the Committee by reaffirming Google's commitment to regulating

     election advertising and to combat disinformation campaigns:

14             Google is deeply concerned about attempts to undermine
               democratic elections.  We are committed to working with the
15             Congress, law enforcement, others in our industry, and the
               NGO community to strengthen protections around elections,
16             to ensure the security of users, and to help combat disinfor-
               mation.  We recognize the importance of this committee's
17             mandate, and we welcome the opportunity to share infor-
               mation and talk about solutions.

18        69.    Google's first pledge to Congress was to release a transparency report in-

19   dicating who had purchased political advertisements and how much they spent on them:

20             In 2018, we will release a transparency report sharing data
               about who is buying election ads on our platform and how
21             much money is being spent.  We'll pair that transparency re-
               port with a database available for public research of election
22             and content from across our ads products.

23             We are also going to make it easier for users to understand
               who bought the election ads they have seen on our networks.
24             Going forward, users will be able to easily find the name of

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

> any advertiser running an election ad on Search, YouTube, and the Google Display Network through an icon on the ad itself.

70.   Google also pledged to ensure that only "U.S. nationals" could "buy U.S. election ads" and to "tightly restrict which advertisers can serve ads to audiences based on political leanings."

71.   Google's most radical pledge, however, was to verify the identity of political advertisers and ensuring that the person running the ad is permitted to do so.  In other words, Google would enact an advertiser and advertisement approval program—***a prior restraint on political advertising*** across its unrivaled search-advertising platform:

> Moving forward, we'll go further, verifying the identity of anyone who wants to run an election ad or use our political interest-based tools and confirming that that person is permitted to run that ad.

72.   Put simply, Google's solution to avoid further embarrassment and government regulation of its platform was to impose the ultimate control on political speech on its platform—pre-approval.  Google would choose who could run ads on its platform, what ads they could run, what topics they could address, and Google would enforce its rules and apply its unfettered discretion over content ***before*** the ad could even begin to run on Google's platform.

**B.   Google Begins Implementing Measures Against State-Sponsored Political Advertising**

73.   On August 23, 2018, Google's Kent Walker posted on Google's company news page, "An update on state-sponsored activity."[2]  The update announced that after an investigation, Google had suspended users of Google's platform that were linked to the Russian-backed Internet Research Agency.  Google had "identified and terminated"

---

[2] An Update on State Sponsored Activity (Aug. 23, 2018), https://www.blog.google/technology/safety-security/update-state-sponsored-activity/.

accounts linked to "coordinated influence operations, including while sharing English-language political content in the U.S."

74. Among the suspensions Google announced was just "1 YouTube channel linked to the Internet Research Agency, which had only a single English language political video with 94 US views."

75. The primary method for blocking these state-sponsored actors was restrictions based on IP addresses and locations. The methods employed were aimed at blocking further uses of Google's platform by state-run entities once identified, not policing the content of the underlying ads.

76. Google linked on the same page its "Protect Your Election" site, which provided tools and recommendations to sovereign entities holding elections and candidates running for office. Google warned:

> During elections, misleading low quality, offensive, and downright false information can be used to influence voters. Here are some resources to help you report, debunk and verify information online.

77. Google's proposed advice hinged on users providing feedback to Google. In other words, Google would take measures once content had been reported:

> **Direct Feedback**
>
> Flag potentially offensive or unhelpful content that appears in Autocomplete and Featured Snippets on Google Search using our new direct feedback tool. Your feedback helps improve our Search algorithms.

78. That month, on August 15, 2018, Google released the archive of political ads that Kent Walker had promised Congress. The new database, called "Ad Library" provided a searchable database of political advertising. The site also provided information about candidates placing ads, the amount of money spent, the dates during which the ads were live, the number of impressions, and type of ad.

79. Today, Google's election and political advertising information is displayed as part of its "Transparency Report." As of the date of this Complaint, Google reported

1   $111,189,600 in advertising spending since May 31, 2018, resulting from a total of

2   149,593 advertisements run on the platform.

3       80.   So-called "battleground" and high-population states accounted for a sig-

4   nificant share of the political ad spending—for example, $11,553,400 was spent in Flor-
    ida, $10,224,300 in California, and $3,496,000 in Pennsylvania.

5       81.   The most amount spent on advertising was "Trump Make America Great

6   Again Committee" at $6,800,800.   The remaining top 35 advertisers, which includes

7   Gabbard, spent amounts from $755,000 to $5,124,600.

8   **C.   Google Implements Its Prior-Restraint on Election Speech and Politi-
        cal Ads.**

9       82.   Although Google had measures such as IP address blocking, feedback sys-

10  tems, and transparency reports at its disposal, it in fact implemented something far more

11  extreme to preserve its control over political advertising.   Specifically, Google imple-

12  mented a pre-approval process for all election-related advertising.

13      83.   As Google explained in a May 4, 2018 release by Kent Walker:

14          As a first step, we'll now require additional verification for
            anyone who wants to purchase an election ad on Google in
15          the U.S. and require that advertisers confirm they are a U.S.
            citizen or lawful permanent resident, as required by law.   That
            means advertisers will have to provide a government-issued
16          ID and other key information.   To help people better under-
            stand who is paying for an election ad, we're also requiring
17          that ads incorporate a clear disclosure of who is paying for it.

18      84.   Google now requires extensive vetting of those seeking to purchase polit-

19  ical ads on its platform.   Those that do not meet pre-qualification requirements and en-

20  dure the pre-qualification process simply cannot not place political advertisements on

    Google.

21      85.   The pre-qualification application process requires two steps and can take

22  five business days to complete.   Under the first step, the campaign must provide Google

23  with the following information: the campaign's Google Ads Customer ID, the cam-

24  paign's name, the campaign's Federal Election Commission ID, the campaign's email

address; and statements under penalty of perjury that the campaign is based in the United States and is legally permitted to purchase election ads.

86.     After the campaign provides this information to Google, **Google verifies that the information is correct**.  Once successfully verified, Google then requires completion of a second step to verify the identity of the campaign's authorized representative.  This second step requires that the individual provide Google with: the campaign name; the campaign's federal Employer Identification Number; the campaign's address; the individual's name; a copy of the individual's government-issued ID (a current U.S. passport, state ID, or driver's license); and statements under penalty of perjury that the individual is (1) a United States citizen or a lawfully admitted permanent resident, and (2) the campaign applying for verification is based in the United States and is legally permitted to run election ads in the United States.

87.     After the individual provides Google with all the above information, Google confirms the information and verifies the account.  Only after successfully obtaining this verification may a campaign may buy and place ads through Google.

88.     With the announcement of its new policy, Google imposed a regulatory scheme that even some governments are unable to impose—one where Google has complete discretion to pre-approve political speech based on its own preferences, with no appellate review or due process to account for mistakes or misconduct.  And because Google is the only choice for search-based advertising at scale, it is now able to pick and choose whose voice will be heard in an election.

## IV.  GOOGLE CENSORS TULSI GABBARD

### A.  Gabbard's Background and Message

89.     Gabbard is the first female combat veteran ever to run for the presidency and is the first female combat veteran ever elected to Congress, along with Tammy Duckworth.  Gabbard has served for over six years on the Foreign Affairs Committee and the Armed Services Committee where she's been intimately involved with sensitive, national security issues.  A war veteran of two tours of duty in the Middle East and

1   presently a major in the US Army National Guard having served for over 16 years,

2   Gabbard is an outspoken critic of regime change wars and the new cold war.

3       90.    Gabbard's presidential campaign is the culmination of a long career of pub-

4   lic service and a desire to step up when called upon for duty.  As a child, Gabbard's

5   parents would enlist her and her siblings in "service days," where the family would pick

6   up litter from beaches or prepare food for homeless families.  At the age of 21, Gabbard

    began serving in the Hawaii State Legislature.

7       91.    After the United States was attacked by terrorists on September 11, 2001,

8   Gabbard enlisted in the Army National Guard, and served two deployments to the Mid-

9   dle East as a soldier.  After fighting in Iraq, Gabbard returned to Hawaii to serve on the

10  Honolulu City Council.  And today, Gabbard continues to serve—now as a fourth-term

    United States Congresswoman and as a Major in the National Guard with sixteen years

11  of service.

12      92.    During her career in Congress, Gabbard has moved to limit the power of

13  big tech companies like Google and has fought to keep the internet open and available

14  to all.  Gabbard has co-sponsored legislation that prohibits multi-tiered pricing agree-

15  ments for the privileged few, and she has spoken in favor of reinstating and expanding

16  net neutrality to apply to internet firms like Google.

17      93.    Gabbard has repeatedly voiced her concerns about the power wielded by

    Google and other Big Tech firms on Twitter:

18

19

20

21

22

23

24

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17



18
19      94.    Google is well aware of Gabbard's policies and actions while in Con-
gress—and of her plan to rein in Silicon Valley's excesses as President.

20      **B.    Tulsi Gabbard's Google Ads Account**

21      95.    Tulsi Gabbard's message is resonating with the American people.  After
22  the June 26–27, 2019 Democratic debate—when millions of Americans heard Gab-
23  bard's message for the first time—she was the single most searched-for candidate.  And,
she accomplished this despite having the third-lowest amount of speaking time.

24

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

96.     In early 2019, in order to share her message with the American people, the Campaign created a Google Ads account.  The Account was governed by various terms of use.  Among other provisions, the terms provided that Google had the right to reject or remove a specific target, ad, or destination at any time for any or no reason.

97.     To run political ads, however, Gabbard would have to be vetted and approved by Google.  If she and her campaign failed to do so, they would effectively be shut out of the search advertising market entirely during the most vital time in Gabbard's campaign.

98.     Gabbard and her campaign applied for approval, and on February 18, 2019, they obtained it.  Google verified the Campaign's and Gabbard's information and granted the Campaign permission to run election ads.

**C.    Google Abruptly Suspends Tulsi Gabbard's Google Ads Account**

99.     On June 28, 2019, right in the heart of a key post-debate campaigning and fundraising period for Gabbard, the Campaign witnessed internet searches for Gabbard start skyrocketing in real time.  Millions of Americans wanted to hear from Tulsi Gabbard, and they went to Google to hear what she had to say.

100.    The Campaign wanted to speak to the millions of Americans asking about Gabbard through Google.  It wanted to answer their questions about Gabbard and to amplify her message.  The Campaign acted quickly and purchased ads to display when people searched Google for certain terms relating to Gabbard.

101.    The ads published were uncontroversial, often mentioning the candidate along with a call for support.  There was no basis to conclude the advertisements were not from the verified candidate or the Campaign.  They were, indisputably Tulsi Gabbard ads—about Tulsi Gabbard, created and purchased by Tulsi Gabbard and her Campaign.

102.    Nonetheless in late June 2019, on the exact day when millions of Americans turned to Google to learn more about Gabbard—on the exact day when Americans

1   made Tulsi Gabbard the most searched-for Democratic candidate on Google—Google
2   abruptly suspended the Account, revoking its pre-approval.

3   103.   On June 28, 2019, millions of Americans asked Google about Tulsi Gab-
4   bard.  Gabbard sought to answer them.  But Google silenced her.

5   104.   Despite the drastic nature of Google's action—arbitrarily suspending the
advertising account of a major candidate for President of the United States the day after
6   a debate, at precisely the moment that candidate was trending on Google—Google of-
7   fered only pretext and unjustifiable excuses for suspending the Account.

8   105.   First, Google said that the Account was suspended due to "problems with
9   billing information or violations of our advertising policies."  This, of course, had noth-
10  ing to do with the stated purpose for Google's extreme measure of imposing a pre-ap-
proval process for political ads—preventing election meddling.

11  106.   Then Google said the Account was suspended because Google "identified
12  suspicious behavior in the payment activity in your account."  Not so.  The advertise-
13  ments were paid for and submitted by the campaign and Gabbard.  There was no evi-
14  dence to the contrary, and Google could cite none.

15  107.   Later, Google changed course again and said the Account was "temporarily
16  suspended to verify your billing information and policy compliance."  Of course, that
excuse was also not true.  Gabbard had been running ads for some time, and no such
17  problem had before emerged.  In any event, Google knew everything about the cam-
18  paign.  It could have continued to run the ads so as not to interfere with election speech
19  and then sought revision of the campaign's payment information.  In no event would a
20  payment issue justify revocation of a prior-restraint approval for political and election
21  speech.

22  108.   Eventually, Google lifted the suspension with no real explanation—just an
opaque statement that Google had "re-reviewed your account and you can now use it to
23  advertise."  The inexplicable suspension and reversal gave Google's leaked presentation
24  prophetic significance:

While the platforms **can suspend an account in an instant, users often endure a slow and laborious appeals process**, compounding the feeling of unfair censorship.

109.   That is precisely what happened to the Gabbard campaign.  The Campaign was **preapproved** by Google to run ads; then that approval was revoked with no redress or recourse; then the approval was quietly (yet inexplicably) reinstated sometime later.  There was no appeal, no redress, not even a human being to talk to about it.  Google had—and used—unfettered discretion to pick and choose who could speak during an election **and when**.

110.   Google's prior restraint regulation on speech—its Verified Election Advertiser preapproval process—was ostensibly justified for one reason, to combat election interference.  Yet none of Google's proffered reasons for suspending Gabbard's **already verified** account even purported to implicate election interference.

111.   Google's excuses make no sense in light of the pre-approval process.  In fact, the purpose of the pre-approval process is to eliminate the possibility of interruption after approval has occurred.

112.   To this day, Google has yet to credibly explain why it suspended the Account—let alone at the precise moment that Gabbard was trending across Google's search and media platforms.

113.   But even though Google couldn't explain **why** it was silencing Tulsi—a prominent Google critic—right as her presidential bid began picking up steam on Google, it certainly didn't reverse course any time soon.  Instead, for hour after hour, as people throughout the country searched for Tulsi Gabbard, and after the Campaign had promptly reached out to Google for explanation and reinstatement of the Account, the suspension continued.

114.   Over the course of several hours, Google simply refused to engage with a major presidential candidate whom it had unilaterally silenced, just as she was trending across the internet.

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

115.   Google's suspension of the Account caused irreparable damage to the Campaign.   Interest and searches for Gabbard during the post-debate timeframe had skyrocketed.   Ads directing searchers to her campaign page would have brought Tulsi Gabbard's unique message to millions of Americans—and would have undoubtedly increased the campaign donations Gabbard received.

116.   Presidential primary candidates can receive millions of dollars in donations in the hours shortly after a debate.   While the Account was suspended, Gabbard was incapable of communicating to voters through Google or its affiliated websites—by far the most effective, and important, method of communication in the Campaign's arsenal.

117.   Additionally, Gabbard has learned that email communications sent by the Campaign are classified as Spam by Google's Gmail product at disproportionately high rates.   Few Gmail users regularly check their spam folders.   Many never do.   Gmail's Spam filter—which relies on secret algorithms designed and controlled entirely by Google—appear to go out of their way to silence messages from the Campaign, further hindering Tulsi's ability to convey her message to the American people.

118.   These actions by Google did not just prevent Gabbard and the Campaign from reaching voters, they also hindered voters from associating with a candidate whose views matched their own.   In other words, as evidenced by the massive search hits for Gabbard after the debate, voters were drawn to Gabbard and her views, and attempted to associate with her politically online (online searches for candidates regularly lead to donations, signing up for email lists, signing up to volunteer, or at minimum engaging with those candidates' websites and social media).   But Google's actions toward Gabbard and her campaign—from suspending the Account to disproportionately sending the Campaigns emails to Spam in Gmail—not only hinder Gabbard's message, they directly touched on the associational rights of likely voters as well.

# V.   THE THUMB ON THE SCALE:  GOOGLE'S POLITICAL SUPPORT OF ITS POLICY CHAMPIONS

119.   Google's stated mission is "to organize the world's information and make it universally accessible and useful."  According to Google, "people around the world turn to Search to find information, learn about topics of interest, and make important decisions."  Consistent with this mission, Google provides a forum for members of the public to interact, share ideas, and engage in important topics across the country and the globe.

120.   But this mission is not executed equally.  Google does not treat all political viewpoints equally.  The company has been criticized by many on the right for censoring content that favors conservative viewpoints.  However, Google's favoritism of political and policy ideas is more nuanced and self-serving.  Simply put, Google supports viewpoints, political causes, and candidates that favor its policy positions over those that do not.

121.   For example, Google-affiliated donors gave $817,855 to Barack Obama's presidential candidacy in 2008, which ranked sixth among all donations to Obama's campaign.  In 2012, that number was $804,240, which ranked third. Google did not even rank in the top twenty donors for Obama's Republican opponents in either election. The Obama Administration's close ties to Google are now well-known: During Obama's two terms in office, Google officials met with the White House on more than 427 occasions, while at least fifty-three officials moved between Google and the White House and vice versa.  Not surprisingly, the Obama Administration championed many of the top policies on Google's wish list, while Obama's Federal Trade Commission closed its antitrust investigation of the company without any meaningful sanctions.

122.   The disparity grew even more stark during the last presidential election. Google employees gave $1.3 million to Hillary Clinton's presidential campaign, compared with $26,000 to the Trump campaign.  What's more, Eric Schmidt, the chairman of Alphabet (Google's parent company), counseled Clinton on strategy during her presidential campaign, and financed Civis Analytics, a startup which provided data and

other technology for her campaign.  Robert Epstein, a social psychologist and internet researcher, argues persuasively that Google's pro-Clinton search bias may have shifted as many as 2.6 million votes to Clinton during the 2016 election.

123.   After President Trump won the election, an internal Google video leaked showing Google's co-founder Sergey Brin, its CEO Sundar Pichai, and other high-ranking Google officers speaking, with dismay, about Trump's election victory.  Their alarm may have been well-founded:  In May of this year, Trump's Department of Justice announced it was exploring whether to open a case against Google for potential antitrust violations.  Google has confirmed that the United States Department of Justice is investigating it for potential antitrust violations.

124.   Now that Google is facing increased antitrust scrutiny, Google has made common cause with the conservative Koch Foundation, funding several conservative groups in the Koch network to publish op-eds, studies and white papers opposing antitrust investigations of Big Tech.

125.   Public information shows that Google manipulates its advertising policies and perhaps even its search results based on political concerns and policy goals.  Google blocked several conservative news websites from its Google Now stories feed, including the Daily Caller, Drudge Report, and Media Matters.

126.   More recently, Google employees engaged in an internal lobbying campaign to block Breitbart from Google's advertising program.  As part of this internal lobbying campaign, one Google employee pressed that "[t]here is obviously a moral argument to be made [to blocking Breitbart] as well as a business case."  While it's not entirely clear what "business case" the Google employee was referring to, it's important to note that Breitbart has been among Google's staunchest critics, alleging that the company routinely censors conservative viewpoints.

127.   While there is no law against a company's employees engaging in political activity, Google is no ordinary company.  As a result of its power, it helps to run elections with its search results and ad offerings, including exercising unilateral control over

nearly all internet search and search advertising—perhaps the single most important platform through which presidential primary candidates communicate with potential voters, and vice versa.  Quite simply, Google could unilaterally and decisively end a presidential candidate's bid for office if it chose to—for example, by tweaking its search algorithms to disfavor the candidate; or blocking the candidate from its ad platforms; or keeping the candidate's communications from getting to interested voters who use Gmail for email communications.

128.   And, in fact, the above is exactly what Google has done, and likely will continue to do, to disfavor the presidential candidacy of Tulsi Gabbard, one of the few independent voices within the Democratic party and vocal critic of Google.  Google has manipulated its search advertising, and likely its email filtering, to disfavor Gabbard.  What is next, if not enjoined by a Court?

## VI.   GOOGLE ADS EMPLOYEES' PUBLIC SUPPORT OF COM-PETING CAMPAIGNS

129.   Google's bias against Gabbard is further demonstrated by the particular Google employees administrating her Google Ads account.

130.   For example, one Google employee administrating Gabbard's Google Ads account, Employee A, has the title "Account Manager, Democratic Elections."

131.   Employee A has control over the Campaign's Google Ads account and was a point of contact for the Campaign—including during the period when the Campaign's account was suspended.

132.   Employee A's social media accounts include repeated, public support for the presidential campaign of Beto O'Rourke, one of Gabbard's opponents in the 2020 Democratic Presidential Primary.

133.   Employee A's direct superior, Employee B, is a Google employee whose title is "Account Executive, Elections."

134.   Employee B has publicly (and exclusively) supported Pete Buttigieg's presidential campaign, including through social media accounts that identify Employee

B as a Google employee.  In fact, one of Employee B's social media accounts features a photograph of Employee B at Pete Buttigieg's presidential campaign headquarters in South Bend, Indiana.  Pete Buttigieg is one of Gabbard's opponents in the 2020 Democratic Presidential Primary.

## VII.  GOOGLE'S ALGORITHMS

135.   An algorithm is a sequence of instructions telling a computer what to do. Algorithms do not write themselves.  They are written by people.

136.   Google employees write Google's algorithms.  The employees tell the algorithms what to do, and the algorithms do it.

137.   Google's algorithms aren't rogue actors.  If a Google algorithm suspends an account, that is because Google programmed the algorithm to do so, such that account suspension was intentionally caused by Google.

138.   Moreover, if Google created a pre-approval process, then its algorithms should have taken that into account.  Any algorithm should have avoided suspension of highly sensitive election advertisements—particularly if the advertiser and/or the advertisement had been pre-approved and could not conceivably pose an election interference threat.

139.   Here, the Campaign's Google Ads account was pre-verified by Google on February 18, 2019, so Google knew that the Account belonged to Tulsi Gabbard and her campaign.  Google knew that the Campaign was buying and placing ads for Tulsi Gabbard's presidential campaign.  And yet Google (perhaps in whole or in part through its algorithms) suspended her account.

* * *

140.   Google has established a clear policy of using its power over speech to favor certain political viewpoints over others.  For example, since June 2019, Google has used its unique control over political advertising and election speech to try to silence Tulsi Gabbard, a presidential candidate who has spoken out against Google.

1    141.   But Tulsi will not be silenced.  Google is trying to change the outcome of

2    an American presidential election, and the government has been unwilling and unable

3    to do anything about it.  This action seeks to change that.

### COUNT ONE

4    **(Violations of the First and Fourteenth Amendments to the U.S. Constitution)**

5    142.   The Campaign realleges and incorporates by reference each of the preced-

6    ing paragraphs as if fully set forth herein.

7    143.   The First Amendment to the United States Constitution protects the free-

8    dom of speech and association, and protects against viewpoint discrimination in the

9    access and use of public spaces, quasi-public spaces, and limited public spaces.  It also

     protects the rights of all Americans to freely associate with others.  The Due Process

10   Clause of the Fourteenth Amendment similarly provides these protections.

11   144.   Google creates, operates, and controls its platform and services, including

12   but not limited to Google Search, Google Ads, and Gmail as a public forum or its func-

13   tional equivalent by intentionally and openly dedicating its platform for public use and

     public benefit, inviting the public to utilize Google as a forum for free speech.  Google

14   serves as a state actor by performing an exclusively and traditionally public function by

15   regulating free speech within a public forum, helping to run elections, and regulating

16   election advertising.  Accordingly, speech cannot be arbitrarily, unreasonably, or dis-

17   criminatorily excluded, regulated, or restricted on the basis of viewpoint or the identity

18   of the speaker on Google's platform.

19   145.   Google's actions, and the actions of its agents, deprive the Campaign of its

20   constitutional rights.  Google has restricted the Campaign's speech and expressive con-

     duct by adopting and applying subjective, vague, and overbroad criteria (the "Subjec-

21   tive Criteria") that give Google unfettered and unbridled discretion to censor speech for

22   arbitrary, capricious, or nonexistent reasons.  The Subjective Criteria fail to convey a

23   sufficiently definite warning to the Campaign (or the public) as to what is prohibited or

24   restricted and, as a result, they allow Google to censor speech at its whim and based on

subjective animus towards the speaker and/or her particular political or religious view-point.

146.   Google applies the Subjective Criteria as a pretext to censor and restrict the Campaign's speech, based not on the content of the speech but because of Tulsi Gabbard's identity and political viewpoints.  Google has restricted the Account, but has not restricted similar Google Ads accounts for other presidential candidates.  Google's application of Subjective Criteria and corresponding restraints on the Campaign's speech is arbitrary and capricious, and/or is based on political or other animus towards the identity and viewpoints of the speaker (*i.e.*, the Campaign), not the actual content of the speech.

147.   Further, because Google's actions impeded the Campaign's ability to associate, at a crucial political moment, with voters who feel similarly to Tulsi Gabbard on important issues, Google's actions impinge on and violate the Campaign's rights to free association and assembly.  Google's actions also violate the Campaign's rights to free association and assembly by blocking potential voters' access to information and messages from Account.  And Google's actions were done with the intent to deprive the Campaign—like other voices critical of Google—of their First Amendment rights.

148.   No compelling, significant, or legitimate reason justifies Google's speech-restricting actions towards the Campaign (e.g., suspending the Account; manipulating Gmail Spam algorithms to target communications from Tulsi).  Even if some interests did exist to justify Google's suspension rules generally, the restrictions imposed on the Campaign's speech are not narrowly or reasonably tailored to further such interests.  Given Google's monopolistic control over the internet, the Campaign has no alternative channel affording a reasonable opportunity to reach its full intended audience.

149.   Google's discriminatory policies are not (and its discriminatory application of those policies is not) viewpoint neutral; they are unreasonable in time, place, and manner; and they are unreasonable in relation to the nature, purpose, and use of the forum.  They impose an unreasonable restraint on the Campaign's protected political

1   speech, motivated by impermissible discrimination against the Campaign's identity and

2   viewpoint.

3      150.   As a direct and proximate result of Google's violations of the clearly es-

4   tablished law of public forums, Gabbard and the Campaign have suffered and continue

5   to suffer immediate and irreparable injury in fact, including lost income, decreased

6   viewership and engagement, and damage to brand and reputation, for which there exists

    no adequate remedy at law.

7      151.   Google's wrongful actions were taken with oppression, fraud, or malice.

8   These actions were arbitrary and capricious.  And they were taken as part of Google's

9   normal course of business, effectuated through both Google-designed algorithms and

10  Google employees and agents.

## COUNT TWO

11  **(Declaratory and Injunctive Relief)**

12     152.   The Campaign realleges and incorporates by reference each of the preced-

13  ing paragraphs as if fully set forth herein.

14     153.   An actual controversy exists between the Campaign and Google as to

15  whether Google's policies and procedures, and their application thereof, violate the

    United States Constitution.  The correct interpretation is that Google's policies and pro-

16  cedures, facially and as applied, violate the Campaign's speech and association rights

17  under the United States Constitution.

18     154.   Unless the court issues an appropriate declaration of rights, the parties will

19  not know whether Google's policies and procedures, and Google's application of their

20  policies and procedures, comply with the law, including the Federal constitution, and

    there will continue to be disputes and controversy surrounding Google's policies and

21  procedures and application thereof.

22

23

24

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

155.   Unless the court issues an appropriate injunction, Google's illegal and un-constitutional behavior will continue, harming both the Campaign and the general pub-lic, which has an overwhelming interest in a fair, unmanipulated 2020 United States Presidential Election cycle.

156.   This injunction and declaratory relief is key to more than just the 2020 United States Presidential Election Cycle. Tulsi is a sitting United States Congress-woman.  Even if she is not ultimately the Democratic Nominee, she will be running for reelection in the House of Representatives in 2020.  It is critical that there are no further prior restraints against her advertising.

## **PRAYER FOR RELIEF**

WHEREFORE, the Campaign prays for relief as hereinafter set forth below:

1.     For a declaration that Google has violated the Campaign's free speech rights, both facially and as applied, under the First and Fourteenth Amendments to the United States Constitution;

2.     For an injunction requiring Google to (i) cease and desist capriciously re-stricting or otherwise censoring the Account, (ii) from censoring or restricting the Cam-paign's speech based on Google's unfettered discretion, or the use or application of ar-bitrary, capricious, vague, unspecified, or subjective criteria guidelines and (iii) from imposing a prior restraint on election-related speech;

3.     For attorneys' fees and costs of suit; and

4.     For any and all further relief that the Court deems just and proper.

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

1   Dated: September 27, 2019          Respectfully submitted,

2

3                                       **Pierce Bainbridge Beck Price & Hecht LLP**

4

5

6                                       By:  _____/s/ Brian J. Dunne_____

7                                            Brian J. Dunne (SBN 275689)
                                             *bdunne@piercebainbridge.com*
8                                            Yavar Bathaee (SBN 282388)
                                             *yavar@piercebainbridge.com*
9                                            Dan Terzian (SBN 283835)
                                             *dterzian@piercebainbridge.com*
10                                           355 S. Grand Ave., 44th Floor
                                             Los Angeles, California 90071
11                                           (213) 262-9333

12
                                             *Counsel for Plaintiff Tulsi Now, Inc.*
13

14

15

16

17

18

19

20

21

22

23

24

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**

1

## **DEMAND FOR JURY TRIAL**

2     Plaintiff Tulsi Now demands a trial by jury pursuant to Federal Rule of Civil

3  Procedure 38 and Local Rule 38-1.

4

Dated: September 27, 2019            Respectfully submitted,

5

6                                    **Pierce Bainbridge Beck Price & Hecht LLP**

7

8

9

                                     By:        /s/ Brian J. Dunne
10                                          Brian J. Dunne (SBN 275689)
                                            *bdunne@piercebainbridge.com*
11                                          Yavar Bathaee (SBN 282388)
                                            *yavar@piercebainbridge.com*
12                                          Dan Terzian (SBN 283835)
                                            *dterzian@piercebainbridge.com*
13                                          355 S. Grand Ave., 44th Floor
                                            Los Angeles, California 90071
14                                          (213) 262-9333

15

16                                   *Counsel for Plaintiff Tulsi Now, Inc.*

17

18

19

20

21

22

23

24

**First Amended Complaint – Tulsi Now, Inc. v. Google, LLC**