**Pierce Bainbridge Beck Price & Hecht LLP**
Brian J. Dunne (SBN 275689)
*bdunne@piercebainbridge.com*
Yavar Bathaee (SBN 282388)
*yavar@piercebainbridge.com*
Dan Terzian (SBN 283835)
*dterzian@piercebainbridge.com*
355 S. Grand Ave., 44th Floor
Los Angeles, California 90071
(213) 262-9333

*Counsel for Plaintiff Tulsi Now, Inc.*

THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Tulsi Now, Inc.**, a principal campaign committee,<br><br>Plaintiff,<br><br>v.<br><br>**Google**, **LLC**, a Delaware limited liability company, and **Does 1–10**,<br><br>Defendants. | Case No. 2:19-cv-06444-SVW-RAO<br><br>**Plaintiff Tulsi Now, Inc's Opposition to Defendant Google, LLC's Motion to Transfer or in the Alternative Motion to Dismiss** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# TABLE OF CONTENTS

INTRODUCTION ....................................................................1

FACTS ...................................................................................2

ARGUMENT ........................................................................5

I.   The First and Fourteenth Amendments Apply to Google's
     Affirmative regulation of federal, political advertising ...................6

     A.   State action exists where—as here—a private entity exercises
          significant and unaccountable influence on elections.............7

          1.   Google has significant power to control elections........8

          2.   Google now performs the traditional and exclusive
               public function of regulating electronic election
               advertising.................................................................10

          3.   Individual government employees use Google ..........11

          4.   Google's reading of *Terry* is wrong...........................11

     B.   Safeguarding election advertising is a matter of national
          security and thus a traditional and exclusive public function11

     C.   Google's stranglehold over access to the Internet buttresses the
          above conclusions ...............................................................12

     D.   Google's contrary authority does not apply..........................13

          1.   Cases about advertisements brought by non-electoral
               candidates are irrelevant ............................................14

1           **2.**     Cases about editorials are irrelevant ............................15

2           **3.**     Plaintiff suffered an injury from Google's verification

3                    procedures ...................................................................15

4  II.   The case should not be transferred to the Northern District of

5     California ...........................................................................16

6           **1.**     Courts can transfer only actions, not claims...............16

7

8           **2.**     The Campaign's claims are outside the scope of the

9                    forum selection clause in the Google Ads agreement 17

10  III.  Conclusion .......................................................................20

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**Tulsi Now's Opposition to Motion to Transfer and/or Dismiss**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*,
   99 F. Supp. 3d 1110 (C.D. Cal. 2015) ................................................................ 16, 19

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
   440 F.2d 133 (9th Cir. 1971) ................................................................................. 14

*Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
   571 U.S. 49 (2013) ................................................................................................. 17

*Brunette v. Humane Soc'y of Ventura Cty.*,
   294 F.3d 1205 (9th Cir. 2002) ............................................................................... 14

*Chicago Joint Bd., Amalgamated Clothing Workers of Am., AFL-CIO v.
Chicago Tribune Co.*,
   435 F.2d 470 (7th Cir. 1970) ................................................................................. 15

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
   412 U.S. 94 (1973) ................................................................................................. 14

*CZ Servs., Inc. v. Express Scripts Holding Co.*,
   No. 3:18-CV-04217-JD, 2018 WL 3972030 (N.D. Cal. Aug. 20, 2018) ......... 18, 19

*Decker Coal Co. v. Commonwealth Edison Co.*,
   805 F.2d 834 (9th Cir. 1986) ............................................................................ 16, 20

*Dobyns v. E-Sys., Inc.*,
   667 F.2d 1219 (5th Cir. 1982) .......................................................................... 11, 12

*Freedom Watch, Inc. v. Google, Inc.*,
   368 F. Supp. 3d 30 (D.D.C. 2019) .......................................................................... 5

*Hardy v. Advocare Int'l, L.P.*,
   No. 2:09–cv–01307–JHN–PJWx, 2010 WL 11509179 (C.D. Cal. Dec.
   10, 2010) ........................................................................................................... 18, 19

*Hudgens v. NLRB*,
   424 U.S. 507 (1976) ............................................................................................... 13

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) .......................................................... 15

*K.H. by & through Humphrey v. Antioch Unified Sch. Dist.*,
  No. 18-cv-07716, 2019 WL 2744721 (N.D. Cal. July 1, 2019) ............................ 6

*La'Tiejira v. Facebook, Inc.*,
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ...................................................... 15

*Lee v. Katz*,
  276 F.3d 550 (9th Cir. 2002) ............................................................ 6, 12

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982) ........................................................................ 6

*Manetti–Farrow, Inc. v. Gucci Am., Inc.*,
  858 F.2d 509 (9th Cir. 1988) ............................................................... 20

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S. Ct. 1921 (2019) .................................................................... 6, 7

*Marsh v. State of Ala.*,
  326 U.S. 501 (1946) ........................................................................ 13

*In re Orange, S.A.*,
  818 F.3d at 962 ........................................................................ 17, 20

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ..................................................................... 13

*Prager Univ. v. Google LLC*,
  2018 U.S. Dist. LEXIS 51000 (N.D. Cal. Mar. 26, 2018) ................................... 5

*Prager Univ. v. Google LLC*,
  No. 17-cv-06064-LHK, 2018 WL 1471939 (N.D. Cal. Mar. 26, 2018) ................. 15

*Telesocial Inc. v. Orange S.A.*,
  No. 14-CV-03985-JD, 2015 WL 1927697 (N.D. Cal. Apr. 28, 2015),
  *aff'd*, *In re Orange, S.A.*, 818 F.3d 956 (9th Cir. 2016) ......................... 17, 18, 19

*Terry v. Adams*,
  345 U.S. 461 (1953) .................................................................. *passim*

*Yan Guo v. Kyani, Inc.*,
  311 F. Supp. 3d 1130 (C.D. Cal. 2018) .............................................. 17, 18, 19

*Yeo v. Town of Lexington*,
   131 F.3d 241 (1st Cir. 1997) (en banc) ................................................................ 15

**Statutes**

23 U.S.C. § 1391(b)(1), (b)(2), and (c)................................................................ 17

28 U.S.C. § 1404(a) ................................................................................ 16, 17

47 U.S.C. § 312(a)(7)........................................................................ 10, 14, 15

47 U.S.C. § 315(b) ............................................................................................ 10

47 U.S.C. § 315(e) ............................................................................................ 10

47 U.S.C. § 317 ................................................................................................ 10

**Other Authorities**

47 C.F.R. § 73.1212 .......................................................................................... 10

47 C.F.R. § 73.1941 .......................................................................................... 10

47 C.F.R. § 73.1943 .......................................................................................... 10

# INTRODUCTION

In June 2019, Google—one of the world's most powerful entities—unilaterally silenced the single most searched-for Democratic candidate for President of the United States at the precise time of her ascent. Google was able to do so because (unlike its competitor Facebook) it has voluntarily chosen to make decisions as to who can speak in United States elections; when; and how. The above facts are undisputed, and are set forth in specific detail in Plaintiff Tulsi Now, Inc.'s First Amended Complaint ("FAC").

Under applicable law, Google's decision to regulate election speech on its giant platform imposes constraints under the First Amendment. Nothing in Google's snarky Motion to Dismiss holds to the contrary. Instead, Google relies of a series of lawsuits by private actors who sought to label Google a state actor simply because it hosts a popular platform for speech—which is indisputably not the claim here. As the FAC makes clear, the First Amendment concern here stems from Google's affirmative choice to regulate election speech on its monopolistic platform, including by imposing a content-based prior restraint through its verified political advertising program. Google doesn't even attempt to justify its speech restraint on the merits.

Perhaps recognizing the law is not nearly as clear-cut here as in other First Amendment lawsuits it has managed to fend off, Google seeks to ensure this case is heard in its home forum, spending half of its motion trying to transfer this action to a particular division of the United States District Court for the Northern District of California. There is no actual legal basis for such a transfer: this action challenging specific speech restraints across multiple services on Google's online platform was properly filed in the Central District of California, where Google has a massive presence and where Plaintiff was harmed by Google's conduct. Indeed, Google can't seriously dispute the propriety of this forum on the merits.

Instead, Google again misdirects, asserting that normal venue rules don't apply, because a particular contract—the Google Ads agreement—says so. But this action isn't

about the Google Ads agreement, as the FAC makes repeatedly clear. Under Ninth Circuit law, the allegedly-controlling forum selection clause relied upon by Google simply doesn't cover this action, and Google's transfer argument (which relies entirely on that clause) fails as a result.

In short, this Court should resolve Google's Rule 12(b)(6) motion on the merits—and deny it. This is the right venue for the FAC, and the FAC plausibly alleges First and Fourteenth Amendment violations by Google—including state action.

## FACTS

Tulsi Gabbard is a United States Congresswoman; a major in the Army National Guard; a veteran of two tours of duty in the Middle East; and a Democratic candidate for President of the United States in the 2020 election. (FAC ¶¶ 3-4, 89-91.) Gabbard is an outspoken critic of regime change wars—and of the outsized power of giant tech companies like Google. (*Id.* ¶¶ 89, 92.)

During her career in Congress, Gabbard has moved to limit Google's power, including by co-sponsoring legislation that prohibits multi-tiered Internet pricing agreements and by speaking in favor of reinstating and expanding net neutrality to apply to Internet firms like Google. (*Id.* ¶ 92.) Gabbard has called for "break[ing] up big tech companies like Facebook, Google, [and] Amazon" and promised to "crack down on the . . . big tech monopolies who threaten our civil liberties and free speech" on Twitter. (*Id.* ¶¶ 93-94.) Google is well aware of Gabbard's policies and calls to action to rein in the excesses and danger posed by big tech. (*Id.*)

In early 2019, in order to share Gabbard's message with the American people, the Campaign created a Google Ads account. (*Id.* ¶ 96.) Google has a durable monopoly in both Internet search and in search advertising: Google Ads is the only way to effectively ensure that people looking for a topic online can see a particular message. (*Id.* ¶¶ 23-47.) As a result, political speakers must—and do—turn to Google. (*Id.* ¶¶ 48-61.) There is no realistic alternative. (*Id.*)

During the 2016 presidential election, state-sponsored content farms sought to interfere with U.S. presidential elections. (*Id.* ¶ 62.) Governmental agencies investigating election interference after the fact discovered that Google's online platform, including its advertising platform, had been weaponized. (*Id.* ¶ 63-67.) Under scrutiny from regulators and the American public for the power and influence it could and does exert over the American electoral process, Google made a striking announcement: the company would enact an advertiser and advertising pre-approval program for political ads—a ***prior restraint on political advertising***, run and overseen solely by Google. (*Id.* ¶¶ 68-72.)

In early 2019, when Gabbard's Campaign sought to begin advertising through Google, it had to go through Google's political speech pre-approval process, known as "Verified Political Advertising." After a detailed, identity-centered application and approval process, the Campaign was deemed worthy of speaking by Google—subject to the company's unfettered whims—on February 18, 2019.

On June 26-27, 2019, the Democratic party held a nationally-televised Presidential debate. (*Id.* ¶ 95.) Gabbard was onstage, and millions of Americans heard her message for the first time. (*Id.*) They wanted to hear more: after the debate, Gabbard was the most searched-for candidate online, despite having the third-lowest amount of speaking time. (*Id.*)

On June 28, 2019, in the heart of a key post-debate campaigning and fundraising period for Gabbard, her Campaign witnessed Internet searches for Gabbard start skyrocketing in real time. Millions of Americans wanted to hear from Tulsi Gabbard, and they turned to Google (which has a durable monopoly in Internet search) to hear what she had to say. (*Id.* ¶ 23-31, 99.)

In order to speak to the millions of Americans asking about Gabbard through Google, her Campaign—which had gone through the rigorous vetting process to become a Verified Political Advertiser months before—purchased ads to display when people searched Google for certain terms relating to Gabbard. (*Id.* ¶ 97-98, 100.) The

ads purchased were entirely uncontroversial, generally mentioning Gabbard along with a call for support. (*Id.* ¶ 101.) There was no basis to conclude the advertisements were not from the verified candidate or the Campaign. They were, indisputably, Tulsi Gabbard ads—about Tulsi Gabbard, created and purchased by Tulsi Gabbard and her campaign. (*Id.*)

Nonetheless, in late June 2019, on the exact day when millions of Americans turned to Google to learn more about Gabbard—and on the exact day when Americans made Tulsi Gabbard the most searched-for Democratic candidate on Google—Google abruptly suspended the Campaign's account, revoking its pre-approval. (*Id.* ¶ 102.) For several hours, Google provided shifting and factually nonsensical explanations for why Gabbard's verified account had been taken down by Google—and why the account could not be simply be swiftly returned to active status. (*Id.* ¶ 104-14.) Several hours later, Google lifted the suspension with no real explanation—just an opaque statement that Google had "re-reviewed your account and you can now use it to advertise." (*Id.* ¶ 108.)

Weeks went by, yet Google declined to offer a credible explanation for its sudden suspension of Gabbard's pre-verified political advertiser account, at the precise moment that Gabbard was at her political apex on Google's search platform. (*Id.* ¶ 109-14.) At the same time, Gabbard's Campaign learned of other statistically unlikely hindrances across Google's platforms, including that email communications sent by the Campaign were classified as Spam by Google's Gmail product at disproportionately high rates. (*Id.* ¶ 117-18.) Recognizing the ongoing threat not just to Gabbard and her Campaign, but to the American electoral process from Google's unfettered prior restraints on political speech, the Campaign sued Google in this Court.

In the time since, Google has refused to engage in an ounce of self-reflection, or to acknowledge the heavy burden placed upon it by the United States Constitution from its affirmative decision to engage in pre-approval of campaign speech. Instead, Google has doubled down, asserting in a Motion that even though it has taken on the role of

1  regulating election speech—***including through prior restraint***—Google has not en-
2  gaged in state action for First Amendment purposes. And perhaps recognizing that this
3  case is not as easily brushed aside as other lawsuits brought against Google pertaining
4  to speech on its platform, Google argues strenuously for a transfer, to make sure this
   action is adjudicated in its home forum.

5                                    **ARGUMENT**

6         Google violated the First and Fourteenth Amendments when it actively silenced
7  Tulsi Gabbard precisely when America was listening for her voice. Specifically, when
8  Google affirmatively decided, through its Verified Campaign Advertising program, to
9  enact and administer prior restraints on election speech across its immensely power-
   ful—and indeed, vital—electronic platform, it subjected itself to First Amendment con-
10 straints under existing law, including the Supreme Court's decision in *Terry v. Adams*,
11 345 U.S. 461 (1953).

12        Simply put, Google performed—and performs—state action in its regulation of
13 campaign speech through its Verified Campaign Advertising program. None of
14 Google's cases establish otherwise—and indeed, Google's Motion largely elides the ac-
   tual theory of First Amendment harm pleaded in the FAC (Google's affirmative decision
15 to pre-approve campaign speech), instead caricaturing this case as a companion to var-
16 ious "Google is such a big forum for speech that it must be subject to the First Amend-
17 ment" cases like *Prager Univ. v. Google LLC*, 2018 U.S. Dist. LEXIS 51000 (N.D. Cal.
18 Mar. 26, 2018), and *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30 (D.D.C.
19 2019). That is not the theory here—and no honest reading of the FAC could find other-
20 wise.

21        The reason Google is so eager to build straw men here seems plain: Google
   simply cannot justify its actions on the merits. Google regulates electoral speech
22 through prior restraints, and content-based approval, yet refuses to acknowledge any
23 Constitutional burden (let alone strict scrutiny) in justifying its constraints. And on the
24 facts, Google's actions plainly interfered with the 2020 Presidential election when it

arbitrarily suspended the Gabbard Campaign's pre-verification at the exact moment Americans were looking to hear from her. Google vehemently argues that the reasons for this interference are not sinister, but at the same time refuses to explain its actions—and refuses to acknowledge any burden to explain or justify its actions when executing a self-imposed role as pre-arbiter of allowed electoral speech. The law requires more.

Finally, Google seeks to move this dispute elsewhere—again seemingly afraid of a ruling on the merits by this Court. But Google's transfer argument is, like its Constitutional argument, grounded in a caricature of the FAC. This case is not confined to, or centered upon, the Google Ads agreement—and the forum selection clause in that agreement is simply inapplicable here.

The Court should deny Google's Motion in its entirety, and hold that Google's actions alleged in the FAC were and are subject to the First and Fourteenth Amendment.

## I.   THE FIRST AND FOURTEENTH AMENDMENTS APPLY TO GOOGLE'S AFFIRMATIVE REGULATION OF FEDERAL, PO-LITICAL ADVERTISING

Google is a private company, but under governing law, it engages in state action when it affirmatively regulates and pre-approves electoral speech across its powerful—indeed, vital—electronic platform, as alleged in the FAC. It was this conduct—performed with no government or other constraints—that allowed the Google to interfere in the Democratic primary against Gabbard, and that risks recurring unless enjoined by this Court.

A private actor can be a state actor when one of several tests is satisfied. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). One such test is the public function test, which is cleared "when the private entity performs a traditional, exclusive public function . . . ." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928; *Lee v. Katz*, 276 F.3d 550, 554–55 (9th Cir. 2002). This test is a "necessarily fact-bound inquiry. . . ." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982); *K.H. by & through Humphrey v. Antioch Unified Sch. Dist.*, No. 18-cv-07716, 2019 WL 2744721 at *3

1   (N.D. Cal. July 1, 2019) ("[T]he state action rule requires a necessarily fact-heavy in-

2   quiry . . . .").

3       Courts have found this test met in various circumstances. *See Manhattan Cmty.*

    *Access Corp.*, 13 S. Ct. at 1928–29. One is where private entities interfere with elec-

4   tions. *See id.* at 1929.

5       This test is met here for multiple reasons.

6   **A.   State action exists where—as here—a private entity exercises signifi-
        cant and unaccountable influence on elections**

7       The unique nature of elections makes it such that private entities that influence

8   the outcome of elections can be considered state actors—even, sometimes, when there

9   is no government action. *Terry v. Adams*, 345 U.S. 461, 469 (1953) (Black, J.) (three-

10  justice lead opinion).

11      The Supreme Court found just this in *Terry*. That case involved an all-white pri-

12  vate political organization. *Id.* at 462–63, 466. The organization would decide which of

    its members should enter the Democratic primaries. *Id.* at 463. Whomever the organi-

13  zation chose had "no legal compulsion . . . to enter Democratic primaries . . . ." *Id.* And

14  the government had no control over the private organization's conduct. *Id.* at 469. In

15  essence, the organization's conduct was no different than, say, a church or a union's

16  endorsing a candidate. *Id.* at 494 (Milton, J., dissenting). Yet despite the complete lack

17  of government involvement, the Supreme Court found the private organization met the

    Constitution's state action requirement. *Id.* at 469. Eight Justices supported this conclu-

18  sion, but they did so over three opinions.

19      Three Justices (the Blackman opinion) found state action through ***inaction***: the

20  state didn't stop the private organization from interfering in the election, allowing it to

21  essentially run its own, preliminary election process. *Id.* 469; *cf. id.* at 485 (Minton, J.,

22  dissenting) ("As I understand Mr. Justice BLACK's opinion, he would have this Court

23  redress the wrong even if it was individual action alone.").

24

Four Justices (the Clark opinion) found state action by the nature of the private organization's power—it was "the decisive power in the county's recognized electoral process." *Id.* at 484. So "whatever disguise," any organization that "takes on those attributes of government which draw the Constitution's safeguards in play" is bound by the constitution. *Id.*

One Justice (the Frankfurter opinion) found state action because government officials—in their private capacities—were presumably involved in the private organization. *Id.* at 474; *cf. id.* at 485 (Minton, J., dissenting) ("Mr. Justice FRANKFURTER recognizes that it must be state action but he seems to think it is enough to constitute state action if a state official participates in the Jaybird primary.).

In short, *Terry* creates three independent tests for finding a private organization is a state actor in the context of elections:

- the government knew about the private organization's conduct and didn't stop it;
- the private organization had significant power to control elections; or
- individual government employees, in their private capacities, participated in the private organization.

Any one of the above can create state action under *Terry.* Google clears all three tests.

### 1.    Google has significant power to control elections

Google has the singular power to control U.S. elections. Google is the gateway to the internet. (FAC at ¶ 27.) It holds roughly a 90% share of the U.S. search market—meaning 9 out of 10 internet searches in the U.S. are on Google. (*See id.* at ¶¶ 29–30.) Because Google is the gatekeeper of search, it is the gatekeeper of search-based advertising. (*Id.* at ¶ 41.) There is no substitute—not even close. (*Id.*)

Given Google's dominance, its search and ad placement policies have a unique ability to influence elections. (*See id.* at ¶¶ 48, 54.) And this is something Google actively pursues. As a result of its power, Google helps to run elections with its search

results and ad offerings, including exercising unilateral control over nearly all internet search and search advertising—perhaps the single most important platform through which presidential primary candidates communicate with potential voters, and vice versa. (*Id.* at ¶ 27.) Quite simply, Google could unilaterally and decisively end a presidential candidate's bid for office if it chose to—for example, by tweaking its search algorithms to disfavor the candidate; or blocking the candidate from its ad platforms; or keeping the candidate's communications from getting to interested voters who use Gmail for email communications. (*Id.* at ¶¶ 27, 48, 52, 54.) The only way for early, grassroots candidate—who lack a sophisticated and long internet presence—to breakthrough on Google and reach voters is through advertising. (*See id.* at ¶¶ 45–46.)

This concern isn't theoretical. Google manipulates its advertising policies and perhaps even its search results based on political concerns and policy goals. (*Id.* at ¶ 125.) Google's pro-Clinton search bias shifted as many as 2.6 million votes to Clinton during the 2016 election. (*See id.* at ¶ 122.) Google actively regulates and limits political discourse on the internet to further its own views of public good. (*See id.* at ¶¶ 60–61.)

Google views itself as the "Good Censor," as determined by Google's own interests and aims (no different than the private organization in *Terry*). (*Id.* at ¶ 49.) Google's so-called benevolent censorship blocked many conservative news sources from its services. (*Id.* at ¶ 125.) It also sought to block Breitbart from Google's advertising program—preventing Breitbart from promoting its news to any meaningful audience. (*Id.* at ¶ 126.)

It's not a surprise that Google would censor so many conservative voices. Google had close ties with the Obama Administration. (*Id.* at ¶ 121.) Its employees gave $1.3 million to Hillary Clinton's presidential campaign (compared with $26,000 to the Trump campaign)—and the chairman of its parent was a campaign strategist for Clinton. (*Id.* at ¶ 122.)

9

This bias extends even to the very persons overseeing Gabbard's Google Ads accounts. These employees publicly supported the campaigns of Gabbard's opponents (one supporting Buttigieg, the other supporting O'Rourke). (*Id.* at ¶¶ 129–34.)

### 2. Google now performs the traditional and exclusive public function of regulating electronic election advertising

The government knows Google has immense power to censor and improperly influence elections. Indeed, Senators and House Members have publicly accused Google of bias and of suppressing free speech—with increasing frequency and ferocity over the past few years. (FAC ¶¶ 62-72.) Regulators have similarly expressed concerns about Google's power and reach, and its implications for U.S. elections (*Id.*) Yet nothing has actually been done about Google.

At the same time, there is little doubt that the United States government ***could*** do something to prevent Google from exercising its bias against election ads by politicians the company doesn't like. The government ***already*** protects electoral candidates' right to advertise on TV and radio. For example, the federal government has set:

- reasonable-access requirements to candidates for federal elective office (47 U.S.C. § 312(a)(7); 47 C.F.R. § 73.1943);

- pricing limitations for election campaign advertisements (47 U.S.C. § 315(b); 47 C.F.R. § 73.1941);

- requirements to maintain online political files of its election campaign advertisers (47 U.S.C. § 315(e); 47 C.F.R. § 73.1943); and

- requirements to identify the sponsor of political advertisements (47 U.S.C. § 317; 47 C.F.R. § 73.1212).

There is no reason the government could not apply these rules to Google. And its failure to do so is a clear abdication of its traditional and exclusive role of regulating electronic election advertising.

In the face of this abdication, Google has affirmatively purported to take up this traditional and exclusive role. It has imposed certain regulations on itself: an online ad database, a verification program, and a transparency report. (FAC at ¶¶ 69, 78, 82–99.) This imposes a state action burden under *Terry*.

### 3. Individual government employees use Google

Finally, as with the government employee "participants" in *Terry*, individual government employees use Google in their unofficial capacities. In fact, the case for state action under the "government employee participant" test is even greater for Google than in *Terry*. Government employees use Google *en masse*—and unlike *Terry*, individual government employees use Google in both their unofficial and official capacities.

### 4. Google's reading of *Terry* is wrong.

Google reads *Terry* differently than the above—and demonstrably incorrectly. Per Google, *Terry* has no meaning beyond a line of cases that preceded it, which found the state action requirement met where the government assigned a party a role in ***managing*** an election. (Mot. at 16.) Google is wrong.

There is, to be sure, a line of state action cases pre-*Terry*. That's no secret. Indeed, *Terry* itself recognizes that line—including the two cases cited by Google. *Terry*, 345 U.S. at 474, 480, 482–83, 492 & nn. 7, 10. But *Terry* materially differed, and went beyond its predecessors—which analyzed state action by a political party. *Terry*, 345 U.S. at 474, 492. *Terry*, by contrast, regarded solely a private organization's actions—which is of course the situation here.

### B. Safeguarding election advertising is a matter of national security and thus a traditional and exclusive public function

Next, safeguarding election advertising on Google—the gateway to the internet and home of 90% of United States internet search—is a matter of national security. And protecting national security is a traditional and exclusive public function. *See Dobyns v. E-Sys., Inc.*, 667 F.2d 1219, 1226 (5th Cir. 1982).

Election security is a national security concern. This is evident from past election interference. In the 2016 U.S. presidential election, foreign agents had interfered with the election by purchasing ads on Google's wire-ranging networks. (FAC at ¶ 64.) Foreign government agents bought tens of thousands of dollars of political ads on Google, for the purpose of influencing the U.S. election. (*Id.* at ¶¶ 64–65, 73–74.)

1  This interference prompted Congressional investigations, and in November 2017,
2  Google was called before the House Intelligence Committee. (*Id.* ¶ 68.) Google testified
3  to the Committee that it was "deeply concerned about attempts to undermine democratic
   elections. We are committed to working with the congress, [and] law enforcement . . .
4  to strengthen protections around elections . . . and to help combat disinformation cam-
5  paigns." (*Id.*) Google then pledged to Congress that it would begin releasing transpar-
6  ency reports, ensuring only U.S. nationals can buy U.S. election ads, and to enact a
7  verification program. (*Id.* at ¶¶ 69–71.)

8  Many months after this, Russian government agents acting were still using
   Google as a vehicle in coordinated influence operations attacking U.S. politics. (*Id.* at
9  ¶ 73.) Eventually, Google learned of the Russian agent's acts and terminated their
10 Google accounts. (*Id.*) Around this same time, Google made good on its promises to
11 Congress, releasing a transparency report and instituting its verification program. (*Id.*
12 at ¶¶ 78–79, 82–84.)

13 Google's work here—attempting to safeguard our future elections—is a tradi-
14 tional and exclusive public function. It is attempting to protect our democracy, our elec-
   tions, our country from interference by foreign sovereigns. This is a uniquely govern-
15 mental endeavor, and to an extent, it was undertaken in tandem with the government.
16 *Cf. Lee*, 342 F.3d at 556 ("It is the function of the [private entity's] administration of the
17 [public forum] that guides and informs our inquiry, not the precise legal arrangement
18 under which the [private entity] leases the [public forum].").

19 **C.     Google's stranglehold over access to the Internet buttresses the above
           conclusions**

20 As described above Google performs traditional and exclusive public functions
21 when it regulates election speech, such as when it interfered with Gabbard's Google
22 Ads account—and as such, it performs state action. Another factor buttresses this con-
23 clusion: Google's virtual total dominion over access to the Internet.

24

1  "[T]he more an owner, for his advantage, opens up his property for use by the
2  public in general, the more do his rights become circumscribed by the statutory and
3  constitutional rights of those who use it." *Marsh v. State of Ala.*, 326 U.S. 501, 506
4  (1946). When "facilities are built and operated primarily to benefit the public" and when
   "their operation is essentially a public function," they are "subject to state regulation."
5  *Id.* Today that is the Internet. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735
6  (2017). "The most important place[] (in a spatial sense) for the exchange of views . . . .
7  is cyberspace . . . ." *Id.* Google is "the gateway to the internet." (FAC at ¶ 27.) Through
8  its virtual total control over the U.S. search market, it is the gatekeeper of search-based
   advertising. (*Id.* at ¶¶ 29–30, 41.) So Google controls what Americans see on the inter-
9  net and what they don't. (*Id.* at ¶¶ 27, 48, 52, 54.)
10     Google may contend that *Hudgens v. NLRB*, 424 U.S. 507 (1976), limits *Marsh*.
11  It doesn't. *Hudgens* involved one question: does the First Amendment grant protestors
12  a right "enter this shopping center for the purpose of advertising their strike . . . ." *Hudg-*
13  *ens*, 424 U.S. at 520–21. In holding they don't, the key rationale was that the private
14  shopping center didn't operate a public forum—it was just a shopping center. *Id.* at 519.
    This isn't true for Google, the gateway to the Internet. *Hudgens* also founded its ra-
15  tionale on a private shopping center not exercising any "comparable assumption or ex-
16  ercise of municipal functions or power." *Hudgens*, 424 U.S. at 519. Which is another
17  rationale that doesn't apply here. Google's power ***exceeds*** the government's.
18     "No government, no ruler or army has a cross-section powerful enough to shut
19  down the Internet." (FAC at ¶ 52.) Google does. (*Id.* at ¶¶ 27, 48–54.) "Google is the
20  only thing sitting between users worldwide and the webpages hosted on the Internet."
    (*Id.* at ¶ 52.) Google has the power to remove a website from its search engine, relegat-
21  ing that website to total obscurity. (*Id.* at ¶ 54.) "This is a power no government has but
22  every government wants." (*Id.*)
23     **D.    Google's contrary authority does not apply**
24     Google cites many cases that supposedly compel a different result. They do not.

### 1.   Cases about advertisements brought by non-electoral candidates are irrelevant

Google's lead case—*Columbia Broadcasting System, Inc. v. Democratic National Committee*—is claimed to be "directly on point in point in holding that the First Amendment does not limit a private publisher's right to decide whether and how to sell space for political advertising."

There are two problems with this claim. First, *Columbia Broadcasting* wasn't about political advertising. It was about advertising "for comment on public issues." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 98 (1973). Second, and more importantly, *Columbia Broadcasting* wasn't about advertising by electoral candidates. It was about advertising by "responsible entities." *Id.* This matters. Under federal law, broadcast stations must give "legally qualified candidate[s] for Federal elective office" "reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station, other than a non-commercial educational broadcast station"—or else they will lose their broadcast licenses. 47 U.S.C. § 312(a)(7).

This case is about elections. And the key issues focus narrowly on election advertising, as well as the government's traditional and exclusive public function in connection with that. The analysis centers on these discrete issues.

But Google's cases shoot well beyond this—and it's not just *Columbia Broadcasting*. Google cites many cases brought by persons who are not electoral candidates (and in many cases unrelated to elections). *See generally Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1207–09 (9th Cir. 2002) (private citizen suing newspaper for Fourth Amendment violation in conducting investigative journalism relating to animal mistreatment); *Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 133–34 (9th Cir. 1971) (movie studio suing the Los Angeles Times for altering a movie advertisement); *Chicago Joint Bd., Amalgamated Clothing Workers of Am., AFL-CIO v. Chicago Tribune Co.*, 435 F.2d 470, 472–73 (7th Cir. 1970) (union seeking to publish advertisement on its picketing of a store); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d

14

981, 984, 987, 991, 994 (S.D. Tex. 2017) (entertainment star suing Facebook for not removing a defamatory post in a timely fashion); *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 434–35 (S.D.N.Y. 2014) (self-proclaimed "promoters of democracy in China" suing a Chinese search engine for blocking search results relating to "the Democracy movement in China"); *Prager Univ. v. Google LLC*, No. 17-cv-06064-LHK, 2018 WL 1471939 at *1 (N.D. Cal. Mar. 26, 2018) (nonprofit company that produced "short educational videos" suing YouTube for censoring certain videos).

None of these have any relevance here.

### 2.    Cases about editorials are irrelevant

Google argues that the "[t]he First Amendment protects the editorial judgments of publishers." (Mot. at 19.) And it cites two cases where courts recognized that political candidates didn't have a right to publish an editorial (*Miami Herald*) or participate in a debate (*Arkansas Education*). It also cites cases recognizing the obvious point that non-candidates also don't have a right to publish editorials. *Yeo v. Town of Lexington*, 131 F.3d 241, 242, 244 (1st Cir. 1997) (en banc).

But this case isn't about editorials or debates. It's about advertising. And federal law grants candidates to federal office a right to place ads. 47 U.S.C. § 312(a)(7). So the First Amendment does not shield Google here.

### 3.    Plaintiff suffered an injury from Google's verification procedures

The Motion contends that Plaintiff didn't suffer an injury from Google's verification program. Not true.

The Campaign was approved under the verification program. FAC at ¶ 139. Yet despite that, Google still arbitrarily censored her ads. *Id.* at ¶¶ 104–09, 138–39. Thus, the verification program was directly responsible for the injuries. *See id.* at ¶ 138 ("Any algorithm should have avoided suspension of highly sensitive election advertisements—particularly if the advertiser and/or the advertisement had been pre-approved and could not conceivably pose an election interreference threat.").

## II.   THE CASE SHOULD NOT BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA

Google seeks to transfer this action to its home forum, relying on a forum-selection clause in the Google Ads agreement. Indeed, Google spills a great deal of ink explaining how forum selection clauses are regularly enforced by courts; how they change the transfer inquiry; and other scintillating details of forum selection clause law—as though Plaintiff would seriously dispute those truisms. But not squarely addressed by Google is the only thing that matters here: the forum selection clause in the Google Ads agreement simply doesn't govern the FAC. As a result, normal venue rules apply—and Google does not and cannot dispute that venue is proper in this district under these rules.

There is no basis for transfer here.

### 1.   Courts can transfer only actions, not claims

Section 1404(a) provides that a district court may transfer a civil case to any other district where it could have originally been filed for the convenience of parties and witnesses and in the interest of justice. 28 U.S.C. § 1404(a). But this solely "allows only for the transfer of an entire 'civil action'"—not individual claims. *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1163 (C.D. Cal. 2015) (citing *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1518 (10th Cir. 1991) ("Section 1404(a) only authorizes the transfer of an entire action, not individual claims.")).

The party seeking transfer bears the burden of showing that transfer is appropriate. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). And ordinarily, when evaluating a motion to dismiss on grounds of *forum non conveniens*, "a plaintiff's choice of forum will not be disturbed unless the 'private interest' and the 'public interest' factors strongly favor trial" in another forum. *Lueck*, 236 F.3d at 1145 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)).

### 2. The Campaign's claims are outside the scope of the forum selection clause in the Google Ads agreement

The Campaign properly filed this case in the Central District of California pursuant to 23 U.S.C. § 1391(b)(1), (b)(2), and (c) because Google is a resident of this district and a substantial portion of the events and actions giving rise to the Campaign's claim took place in this district. (*See* FAC at ¶ 19.) Google does not dispute the allegations that form the basis for venue in this district. Instead, Google seeks to transfer the case pursuant to Section 28 U.S.C. § 1404(a) based entirely on the forum selection clause in the Ads Agreement, which Google claims requires this case to be transferred to the Northern District under *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas,* 571 U.S. 49 (2013). Google's reliance on *Atlantic*, however, is misplaced because the Campaign's claims in the FAC are outside the scope of the forum selection clause Ads Agreement.

"If the claims do not fall within the scope of the forum selection clause, the Court need not reach the *forum non conveniens* issue . . . ." *Telesocial Inc. v. Orange S.A.*, No. 14-CV-03985-JD, 2015 WL 1927697, at *3 (N.D. Cal. Apr. 28, 2015), *aff'd*, *In re Orange, S.A.*, 818 F.3d 956 (9th Cir. 2016). "Whether a forum selection clause applies to non-contractual claims 'depends on whether resolution of the claims relates to interpretation of the contract' that contains the forum selection clause. The outcome depends on the breadth of the language used in the forum selection clause." *Yan Guo v. Kyani, Inc.*, 311 F. Supp. 3d 1130, 1139 (C.D. Cal. 2018) (quoting *Manetti–Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 (9th Cir. 1988).

Although forum selection clauses requiring all disputes "arising out of or relating to" or "in connection with" an agreement to be adjudicated in a specified forum are afforded broad application, they do not apply to any and all litigation between the parties. *In re Orange, S.A.*, 818 F.3d at 962. Rather, courts in the Ninth Circuit apply such clauses "only to [ ] claims . . . that will require the interpretation of the agreements, or a determination of whether the parties complied with their terms. . . The determinative question is whether [plaintiff's] claims will require the Court or the trier of fact to make

17

any findings about the adequacy of the parties' performance under the [applicable] agreements." *CZ Servs., Inc. v. Express Scripts Holding Co.*, No. 3:18-CV-04217-JD, 2018 WL 3972030, at *2 (N.D. Cal. Aug. 20, 2018) (denying motion to transfer where, although agreement governing relationship between the parties contained forum selection clause, most of plaintiff's claims would depend on evidence and proof unrelated to the agreement governing relationship with the parties). *See also Yan Guo v. Kyani, Inc.*, 311 F. Supp. 3d 1130, 1139 (C.D. Cal. 2018) (forum selection clause in independent distributor agreement did not apply to plaintiffs' claims arising out of their role as distributors because they were not related to the "'rights and duties enumerated'" but instead arose "out of alleged conduct outside of what occurred and was contemplated by that agreement"); *Telesocial Inc. v. Orange S.A.*, No. 14-CV-03985-JD, 2015 WL 1927697, at *3 (N.D. Cal. Apr. 28, 2015) (plaintiff's statutory and common law claims for alleged theft of trade secrets not subject to forum selection provision in non-disclosure agreement because they could be "'adjudicated without analyzing whether the parties were in compliance'" with the agreement); *Hardy v. Advocare Int'l, L.P.*, No. 2:09–cv–01307–JHN–PJWx, 2010 WL 11509179, at *5 (C.D. Cal. Dec. 10, 2010) (distributor of products sold by the defendant, was not required to litigate intentional and negligent misrepresentation claims in the forum designated in the parties' Distributor Agreement because resolution of those claims would not require interpretation of agreement).

Adjudication of the Campaign's claims in this case does not require interpretation of the Ads Agreement or a determination of whether the parties complied with its terms. Rather, the FAC asserts claims for violations of the First and Fourteenth Amendments based on Google's operation of its platforms and services, "including but not limited to Google Search, Google Ads, and Gmail." (FAC at ¶ 144.) Specifically, the FAC alleges that Google applies subjective, vague, and overbroad criteria in operating those platforms and services "as pretext to censor and restrict the Campaign's speech, based not on the content of the speech but because of Tulsi Gabbard's identity and political viewpoints." (FAC at ¶¶ 145–146.) The FAC alleges these violations have occurred not only

18

through Google's suspension of the Campaign's Google Ads account, but also by "manipulating Gmail Spam algorithms to target communications from Tulsi." (FAC at ¶ 143; *see id.* at ¶ 117.)

Google does not argue in its Motion that the Campaign's claims regarding Google's Spam algorithms are related to or arise from the Ads Agreement. (Mot. at 7–9.) Its request to transfer should be denied on this ground alone. *See Almont Ambulatory Surgery*, 99 F. Supp. 3d at 1163 ("§ 1404 allows only for the transfer of an entire 'civil action.'"); *see also CZ Servs.*, 2018 WL 3972030, at *4. With respect to the Campaign's claims regarding Google's suspension of its Ads account, Google simply claims that it is "indisputable" they arise out of or relate to the Google Advertising Program. Google fails to explain, however, how or why adjudication of these claims would involve analysis or interpretation of the Ads Agreement or the parties' performance thereunder. (Motion at 8:15–17 (alterations omitted).) Nor can it – Google and the Campaign agree that the Ads Agreement grants Google the right to suspend an account or reject or remove an ad at any time for any reason. (*See* Motion at 2:19–20; FAC at ¶ 96.) Indeed, the Campaign's claims arise from the fact that, in making such decisions, Google applies criteria *outside the terms of the Ads Agreement*. (FAC at ¶¶ 145–46.) Adjudication of these claims does not depend on proof or evidence relating to the terms of the Ads Agreement, and, thus, the forum selection provision is inapplicable. *See CZ Servs.*, 2018 WL 3972030, at *2; *Yan Guo*, 311 F. Supp. 3d at 1139; *Telesocial*, 2015 WL 1927697, at *3; *Hardy v. Advocare Int'l, L.P.*, 2010 WL 11509179, at *5.

Google's Motion cites to several cases that were transferred to the Northern District of California pursuant to the forum selection clause in some iteration of the Ads Agreement;[1] however, none of the cases involved First Amendment claims arising from Google's extracontractual conduct, like here. (*See* Mot. at 8.) Those cases are, therefore,

---

[1] All of Google's cases involve an earlier version of the Ads Agreement than the one Google's Motion relies on, which was updated in April 16, 2018. (White Decl. ¶ 2; *see* Mot. at 8.)

**Tulsi Now's Opposition to Motion to Transfer and/or Dismiss**

1   inapplicable. Similarly, in the cases Google relies on to argue that "there is no issue with
2   applying a forum-selection provision to First Amendment claims," the court did not
3   consider whether the First Amendment claims were *within the scope* of the forum se-
    lection provision at issue. (*See* Mot. at 8–9.)
4
        In short, the Campaign's claims in the FAC do not require interpretation of the
5   Ads Agreement and are outside the scope of the forum selection clause. *In re Orange,*
6   *S.A.*, 818 F.3d at 962-963; *Manetti–Farrow*, 858 F.2d at 514. Because Google has not
7   otherwise shown that the Central District of California is an inconvenient forum in
8   which to litigate these claims, transfer to the Northern District of California under Sec-
    tion 1404 is unwarranted. *See Decker Coal*, 805 F.2d at 843. The Court should, there-
9   fore, deny Google's Motion to Transfer.
10  **III.   CONCLUSION**
11      Google's Motion should be denied. There is no basis to dismiss or transfer this
12  action. To the extent the Court decides to grant Google's Motion to Dismiss, Plaintiff
13  respectfully requests leave to amend.
14
15
16
17
18
19
20
21
22
23
24

**Tulsi Now's Opposition to Motion to Transfer and/or Dismiss**

Dated: January 27, 2020

Respectfully submitted,

**Pierce Bainbridge Beck Price & Hecht LLP**

By:    /s/ Brian J. Dunne

Brian J. Dunne (SBN 275689)
*bdunne@piercebainbridge.com*
Yavar Bathaee (SBN 282388)
*yavar@piercebainbridge.com*
Dan Terzian (SBN 283835)
*dterzian@piercebainbridge.com*
355 S. Grand Ave., 44th Floor
Los Angeles, California 90071
(213) 262-9333

*Counsel for Plaintiff Tulsi Now, Inc.*